**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                            )
CLAIRE QUINLISK,                            )
                                            )
            Plaintiff,                      )
                                            )
            v.                              )        **Civil Action No.**
                                            )        **07-40292-FDS**
UNUM LIFE INSURANCE COMPANY                 )
OF AMERICA,                                 )
                                            )
            Defendant.                      )
_____)

**MEMORANDUM AND ORDER ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

        This is a civil action arising out of a denial of long-term disability benefits.  Plaintiff Claire

Quinlisk was covered under a long-term disability insurance plan administered by defendant Unum

Life Insurance Company of America.  In June 2001, she developed severe pelvic and vaginal pain

that her doctors diagnosed as vulvodynia.  She contends that she is totally disabled and cannot

work at any occupation.

        Unum originally paid her benefits for 14 months (six months of short-term benefits and

eight months of long-term benefits), but then determined that she was not disabled and

discontinued payments.

        Quinlisk unsuccessfully appealed the initial termination of her benefits.  Several years later,

as a part of a settlement agreement with several regulatory agencies, Unum agreed to offer certain

claimants a reassessment of their claim pursuant to certain decision-making parameters.  Unum

reassessed Quinlisk's claims under that process, and partially reversed its earlier decision.  Unum

paid Quinlisk an additional 16 months of benefits, but also determined that as of December 2003,

she was capable of engaging full-time work, and was therefore not entitled to receive additional payments.

Both parties have moved for summary judgment on the basis of the administrative record.[1] For the reasons set forth below, both motions will be denied, and the matter will be remanded to the plan administrator for further proceedings.

## I.    Factual Background

Claire Quinlisk was born in 1946.  In 1967, she earned a nursing certificate, and between 1968 and 2001 she held various nursing positions.  In August 2000, she accepted a position as a charge nurse at the Mariner Health Clinic.  Her job required some mobility and physical activity, including helping to move and lift patients.  Mariner provided its employees, including Quinlisk, with short-term and long-term disability coverage through a plan issued by Unum.

At some point prior to June 2001, Quinlisk was diagnosed with fibromyalgia. (*See* RSA/CRU-01774).[2]  Although she occasionally took sick leave for her symptoms, she was

---

[1] Citations are to the administrative record.  The record consists of the file of the original claim and original appeal (cited as LTD/LW) and the file of the reassessment (cited as RSA/CRU).  The parties have also submitted a copy of the long-term disability plan (cited as LTD) and a copy of the Regulatory Settlement Agreement (cited as RSA).  The pages of the record were numbered in reverse order; thus, for example, page LTD/LW-00007 follows page LTD/LW-00008.

[2] Unum contends that Quinlisk never received a proper fibromyalgia diagnosis because she was never given a tender-point examination, a test that involves the examination of 18 specific points on the body.  Quinlisk contends that although no physician ever concluded that specific examination, several have noted that she is tender at many of the 18 points.  (*See, e.g.* RSA/CRU-01848 (Dr. Christensen's report of his 12/17/01 appointment with Quinlisk) (regarding fibromyalgia, "on examination today she is still tender over the typical spots, i.e., the supraspinatus tendon, the triceps tendon and the biceps tendon")*; see also* RSA/CRU-01486 (report from Quinlisk's 11/18/03 appointment with Dr. Farbman) (upon physical exam, Farbman noted "tenderness in the trigger points in the posterior upper chest and now tenderness in the anterior upper chest bilaterally . . . .  Some tenderness over the paraspinal area, S1-2"); RSA/CRU-01691 (report from 4/27/06 examination by Dr. Upchruch) ("marked generalized tenderness in virtually all areas palpated, but particularly in the classic areas in upper and lower extremities typical of fibromyalgia")).

generally able to manage the pain with medication, and she continued to work and lead a relatively normal life.

On June 9, 2001, before leaving for work, Quinlisk lifted a heavy box off the floor of her basement. She immediately felt severe pain in her left groin and vulva area. The pain was so intense that she was unable to go to work that day. She has remained out of work since that time.

On June 22, Dr. Owen Christensen, her primary care physician, diagnosed her condition as vulvodynia. Dr. Christensen noted that she was spending 90% of her time in bed and that standing upright increased her pain. (*See* RSA/CRU-01781).

### A.    Short-Term Disability Benefit

When the pain did not abate after several days, Quinlisk applied for short-term disability benefits. As part of that process, on July 23, 2001, Dr. Christensen completed a disability evaluation form for Unum. On the form, he noted that her diagnosis was vulvodynia with subjective symptoms of pelvic and vaginal pain. (*See* LTD/LW-00004). He noted that the pain was persistent, that her time-frame for recovery was unknown, that she had severely limited functional capacity with minimal activities of daily life, and that she was incapable of minimum sedentary activity. (*Id.*). Unum agreed to pay her benefits through December 7, 2001—the maximum length of short-term benefits under the plan.

On October 12, 2001, Dr. Christensen noted that Quinlisk's fibromyalgia symptoms were usually worse in the morning and gradually quieted down as the day goes on, but her vulvodynia-related pain did not go away at all. (*See* RSA/CRU-01804). On November 2, Dr. Christensen noted that she was "currently . . . unemployable," and that "when she just gets up and walks

around for about ten minutes or so, she starts to get the vulvodynia pain again, and this once

again puts her back into the bed mode."  (*See* RSA/CRU-01805).

B.      **Long-Term Disability Benefit**

In December 2001, when her short-term disability benefits were exhausted, Quinlisk

applied for long-term benefits.  (*See* LTD/LW-00821-00820).  As part of the application process,

Unum sought and obtained an updated disability report from Dr. Christensen.  (*See* LTD/LW-

00093-00092).  That report was provided in January 2002.

The report stated that Quinlisk was capable of frequent lifting of 0-10 pounds and

occasional lifting of 11-20 pounds, and should not attempt to lift more than 20 pounds.  It also

stated that she was capable of occasional bending, kneeling, climbing stairs, and reaching above

her shoulder.  The form asks how many hours of sedentary activity (sitting and standing) the

person can perform; Dr. Christensen appears to have written "0."[3]

Under the terms of the long-term disability plan, an employee is "disabled"—and therefore

entitled to long-term benefits—when Unum determines that the employee cannot perform the

"material and substantial duties" of his or her own occupation due to sickness or injury.  (*See*

LTD/LW-00423).  In order to continue receiving long-term benefits after the first 24 months, the

employee must be unable, due to the same sickness or injury, to perform "the duties of any gainful

occupation for which [he or she is] reasonably fitted by education, training or experience."  (*Id.*).

On March 26, 2002, Unum sent Quinlisk a letter informing her that it had determined that

she was disabled from performing her own occupation within the meaning of the plan, and that

---

[3] As described below, because of an issue concerning Dr. Christensen's handwriting, defendant has assumed that he wrote "6."

4

accordingly she was entitled to long-term disability benefits beginning December 2001.  (*See* LTD-LW-00337-00332).[4]  In the letter, Unum reserved its rights regarding payment of future benefits, and requested additional information.  She continued to provide Unum with updated medical records.

### C.      Surveillance

For three consecutive days in April 2002, an investigator hired by Unum conducted a video surveillance of Quinlisk.  The investigator sat outside her house, following and recording her activities when she emerged.  The video showed Quinlisk emerging from her home occasionally to walk her dog, drive to church, drive to the grocery store to shop, unload her groceries from the car after returning home, drive to a convenience store to purchase a newspaper, and have her tank filled up at a full-service gas station.

### D.      Termination of Long-Term Disability Benefit

On July 30, 2002, Unum sent Quinlisk a letter notifying her that it was discontinuing her benefits and closing the claim.  (*See* LTD/LW-00739-00736).  The letter stated that Unum had determined that there was no clinical documentation to support her reports of pain, and that no tender-point examination had been completed for a diagnosis of fibromyalgia.  The letter also noted the surveillance video and stated that there was no evidence that Quinlisk is unable to perform her "sedentary occupation as an RN."

---

[4] The  letter noted the following:  "Disabilities, due to sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness. . . have a limited pay period up to 24 months."  ( *See* LTD/LW-00336).  The letter also includes the following: "The restrictions and limitations provided are based solely on your self-reported symptoms, labeled as vulvodynia, as no etiology has been determined. . . . your claim is subject to the 24-month self-report limitation outlined above."  (*See* LTD/LW-00334).

Quinlisk did not, however, return to work or obtain new work, and continued to consult regularly with physicians about her condition.

### E.    Unexplained Physical Defect

In the latter half of 2002, several physicians recognized a defect (variously referred to as a mass, lump, inflammation, or thickening) at the site of Quinlisk's pain.  None, however, found a physiological connection between the defect and her reported pain.  For example, on September 3, 2002, Dr. Christensen noted a definite thickening of the adductor tendon at the point of insertion into the pubic ramus.  (*See* RSA/CRU-01844).  On September 17, an MRI revealed "a 1 cm, fairly well circumscribed nodule."  (*See* RSA/CRU-01856).[5]  On September 23, Dr. Christensen noted a "palpable" "trigger point" at the point of insertion of adductor muscle of the thigh into the pubic ramus.  (*See* RSA/CRU-01915).  On October 1, Quinlisk was examined by Dr. Donald Stevens, a pain management specialist, who noted a soft tissue thickening just posterioinferior to the adductor tendon, but concluded that it would not be likely to cause her pain.  (*See* RSA/CRU-01860).

On October 22, 2002, Dr. Christensen examined Quinlisk and reviewed the results of a recent CAT scan.  (*See* RSA/CRU-01914).  He said that it "appears [from] the current CAT scans . . . that she has two areas of what appear to be linear defects associated with sclerosis, consistent with ongoing inflammation," as well as a "small cystic lesion that I can palpate. . . ." (*Id.*).  He noted that an earlier bone scan did not show these defects, but hypothesized that perhaps that was because her bladder was not being continuously emptied with a catheter during

---

[5] A November 6 addendum to the same MRI report indicates that "[o]n the coronal T1 weighted images, there is a dark line running in the craniocaudal direction in the left superior pubic ramus" in the "exact location of [patient's] pain."  (*See* RSA/CRU-01916).

the earlier scan.  (*Id.*).

###### F.    The Appeal of the Benefit Termination

During this period, Quinlisk continued to submit updated medical information to Unum.

On October 23, 2002, Unum sent her a letter confirming receipt and review of the additional

information she submitted, but indicating that it was not sufficient to reverse its earlier decision.

(*See* LTD/LW-00726-00725).  The letter also stated that she had not submitted any tender-point

examination results for fibromyalgia, and that based on the documentation on file, she was not

expected to be prevented from performing the duties of "sedentary nursing."  (*Id.*).  On October

25, Quinlisk responded in a handwritten letter notifying Unum of her desire to appeal the

termination of benefits.  (*See* LTD/LW-00563-00560).  The letter stated that she was in constant

pain, but that some days the pain was less severe than others.  (*Id.*).  It also addressed the video

surveillance; it stated that despite her pain, she has to purchase groceries once a week, but that

upon her return home she has to get in bed for several hours to help relieve the pain.  (*Id.*).

On December 12, 2002, Unum sent Quinlisk a letter denying her appeal.  (*See* LTD/LW-

00703-00699).  According to the letter, Unum based its decision on the fact that the surveillance

video showed that she was capable of performing sedentary nursing work.  (*Id.*).

###### G.    Continued Difficulty Determining the Cause of Quinlisk's Pain

On November 21, 2002, Quinlisk had an appointment with Dr. Kelton Burbank, an

orthopedic surgeon, who noted a palpable, non-bony mass.  (*See* RSA/CRU-01874).  On

December 6, she had another bone scan, this one with a catheter in her bladder, but no

abnormalities were observed.  (*See* RSA/CRU-00381).  Later that month, she saw Dr. Andrea

Damour, an obstetrician/gynecologist, who noted that the "lump in the left labium

majus . . . seems to become larger and more painful when she is lifting or bearing down." (*See* RSA/CRU-01729). The next day, she had a follow up appointment with Dr. Burbank, who noted that the bone scan had been inconclusive, but that "[t]here is an irregularity in the superior pubic ramus on the left. It is non-displaced." (*See* RSA/CRU-01910). He also noted that she "continues to have problems and continues to have a 'bump.'" (*Id.*).

Throughout 2003, Quinlisk continued to see Dr. Christensen and various specialists. In January 2003, she visited the Dartmouth Hitchcock Medical Center; the clinic nurse reported that she arrived at the clinic in a wheelchair, and that she "rises slowly to a standing position using the chair arms for support." The nurse also reported that "she has a quite antalgic [] gait, favoring her left side. After taking the few first steps her gait evens out but is never smooth. It continues to be antalgic." (*See* RSA/CRU-01909-01907). The medical report notes "[a] discrete, freely mobile . . . 3mm x 3 mm tender mass . . . just medial and superior to the adductor longus tendon insertion site." (*Id.*). In February and April 2003, Dr. Christensen noted a "little nodularity" and "exquisite tenderness over the adductor tendon as it inserts into the pubic ramus." (RSA/CRU-01906). He also noted that she reported feeling a little bit better, but that examination confirmed "the persistent area of pain and swelling." (RSA/CRU-01904).

## H.    Award of Social Security Benefits

In January 2004, the Social Security Administration determined that Quinlisk was totally disabled, and awarded her disability benefits. (*See* RSA/CRU-01631).[6]

---

[6] The parties dispute the significance of the SSA award of benefits. Although the SSA determined that Quinlisk is disabled from performing all work, including sedentary work, Unum contends that two factors that contributed to the SSA's determination are not, by the terms of the plan, relevant here.

First, Unum contends that SSA regulations apply different disability standards to persons older than 55. *See* 20 C.F.R. § 404, Subpart P, Appendix 2. Thus, it is not inconsistent for the SSA to have determined that

II.     **Regulatory Settlement Agreement and the Claim Reassessment**

In November 2004, as a result of an examination of Unum's practices by several state insurance commissioners, Unum executed a Regulatory Settlement Agreement ("RSA").  In the RSA, Unum agreed to provide an opportunity for certain claimants to receive *de novo* review of their previously denied claims.  (*See* RSA-001-003).  The RSA required Unum to implement certain procedures and audits to ensure that these claims were handled without bias.  (*Id.*).

Quinlisk was offered an opportunity to participate in the claim reassessment process.  In June 2006, she submitted a Reassessment Information Form and provided medical records and other information to Unum.  The submission included medical records after the appeal of the initial benefits termination.[7]  Records from the period 2004 to 2006 indicated that she still experienced chronic pelvic pain from vulvodynia.  (*See, e.g.,* RSA/CRU-00451 (report from 3/22/04 examination by Dr. Hoisington) and RSA/CRU-01998 (report from 4/11/05 appointment with Dr. Christensen)).  The records also indicated that she took high doses of painkillers in order to engage in minimal activities such as weekly grocery shopping, which caused her to be excessively tired much of the time.  (*See* RSA/CRU-01691 (report from 4/27/06 examination by Dr. Katherine Upchurch, a rheumatologist)).

---

Quinlisk could sit for about six hours in a normal work day and could occasionally lift up to 20 pounds, but also to find that she was totally disabled from sedentary work.  (*See* RSA/CRU-01498-01492).  Unum contends that the long-term disability plan does not make special allowances for those over 55.

Second, the SSA disability determination listed the primary diagnosis as affective disorder and the secondary diagnosis as fibromyalgia and vulvodynia.  (*See* RSA/CRU-01631).  Unum contends that Quinlisk was treated for anxiety during the "pre-existing condition" period before she was covered under the LTD plan, making her ineligible for benefits for mental illness.  Quinlisk does not dispute that, but points out that the SSA concluded that the cause of her affective disorder and depression was the constant pain from fibromyalgia and vulvodynia, and the severe limitations on her lifestyle caused by the pain.  (*See* RSA/CRU-01480-01476).

[7] In July 2006, Quinlisk provided Unum with a copy of her Social Security Administration file.

Dr. Christensen also completed and submitted an updated work capacity rating form. The form indicated that Quinlisk could sit continuously for only half an hour; could stand continuously for less than 5-10 minutes; and could walk continuously for only 10 minutes. (*See* RSA/CRU-01682). It also indicated that she could lift or carry up to 10 pounds only 10% of the time, but never lift or carry 11 pounds or more; that she could occasionally bend, but never squat, crawl, or climb; that she could not work, and that she had reached her medical end result. (*Id.*).

In an affidavit submitted with her Reassessment Information Form, Quinlisk stated that in an attempt to alleviate her pain, she had tried various diet variations, swimming, crutches, massage therapy, hot and cold packs, lidoderm patches, new bed mattresses, and bed rest. (*See* RSA/CRU-02124). None helped significantly. (*Id.*). Instead, she said she obtains some, but not complete, relief, from a cocktail of different pain medications taken throughout the day. (RSA/CRU-02123). As of 2006, she still had a lump in her pelvic area; she reported that it made sitting excruciatingly painful. (*See* RSA/CRU-02127).

As part of the reassessment process, Dr. James Bress reviewed Quinlisk's file. He produced a Clinical Data Review and Analysis report on May 31, 2007, and a report on her Medical Restrictions and Limitations Due to Vulvodynia on June 14. (*See* RSA/CRU-00148-00143 and RSA/CRU-00102-00100). Dr. Bress concluded that as of June 2001, she was capable of full-time, sedentary-to-light work, and that she had no restrictions or limitations on her ability to sit. (*See* RSA/CRU-00101). He based this conclusion on, among other things, a March 2002 comment by Dr. Christensen that Quinlisk was gaining weight even though she was physically active; the video surveillance, which showed she was able to walk, sit, bend, and lift without difficulty; and his belief that some of her ailments may have been caused by the personal stress

10

(mentioned in several doctor's notes) of caring for her ill mother.  (*Id.*).[8]

The May 2007 report noted that Dr. Christensen's Functional Capacity Report indicates that Quinlisk could sit or stand for "6" hours.  (*See* RSA/CRU-00144).  As noted above, the form asks how many hours of sedentary activity (sitting and standing) plaintiff can perform; Dr. Christensen appears to have written a "0," not a "6."

Both reports by Dr. Bress also noted that on November 21, 2002, Dr. Burbank examined Quinlisk and reported that she had left pelvic pain that was "worse when she talks."  (*Id.*; *see also* RSA/CRU-00101).  In both reports, Dr. Bress noted that this was a very strange phenomenon, and that there is no physiological reason why pelvic pain would be worse when one talks.  (*Id.*).  In fact, Dr. Burbank's report indicates that Quinlisk's pelvic pain is "worse when she *walks*."  (*See* RSA/CRU-01874 (emphasis added)).[9]

As part of Unum's reassessment of Quinlisk's claim, Richard Byard, a vocational specialist, also reviewed her file on June 19, 2007.  He concluded that the position Quinlisk had held as of June 2001 required a medium level of physical exertion, and that she did not have the ability to perform that level of work.  (*See* RSA/CRU-00094).  He also concluded, however, that Quinlisk did have the ability to do full-time sedentary work, and that she was fitted—by education, training, and experience—to fill entry-level positions as a nurse case manager, a telephone triage nurse, or an insurance file review nurse.  (*See* RSA/CRU-00093).  Byard

---

[8] Dr. Bress stated in his report that Quinlisk was capable of lifting 20 pounds.  He apparently arrived at this conclusion by observing that, on the surveillance tapes, she was "lifting a 24 [pack] of soda (weight 18 lbs) easily with one hand on two occasions."  (*See* RSA/CRU-00144).  Quinlisk disputes this assessment, and contends that she was never shown lifting a 24 pack, but rather "four 12-packs of canned soda *separately*" (emphasis in original) and that "[she] alternated between one and two hands to lift the soda."  (*See* Pl. Mem. at 21).

[9] Neither report by Dr. Bress discussed the physical defect at the site of Quinlisk's pain.

concluded that positions in these professions existed in the Worcester market with wages greater than what she would receive in long-term disability benefits.  (*Id.*).

On July 24, 2007, Unum notified Quinlisk that it had reversed its initial decision to deny her long-term disability benefits from August 6, 2002, through December 6, 2003 (the remainder of the 24-month "own occupation" disability period).  (*See* RSA CRU-00049).[10]  In the same letter, however, Unum notified her that it had concluded that she was capable of sedentary work, that there were sedentary jobs for which she was fitted by education, training, and experience, and that therefore, it was reaffirming its decision not to pay benefits after the initial 24-month "own occupation" period (in other words, after December 2003).  (*See* RSA/CRU-00047).[11]

### III.   **Procedural History**

Quinlisk filed this suit on November 19, 2007, challenging Unum's decision under the RSA's claim reassessment process to deny her claim for long-term disability benefits after December 6, 2003.  On May 28, 2008, she filed an amended complaint, containing three counts, all brought pursuant to the Employee Retirement Income Security Act ("ERISA"):  wrongful denial of long-term disability benefits December 2003 through the present (Count 1), wrongful denial of waver-of-premium on life insurance plan (Count 2), and attorneys' fees and costs (Count 3). Quinlisk has since filed a stipulation of dismissal of Count 2.

Both parties have filed motions for summary judgment on all counts.

### IV.   **Analysis**

---

[10] Under separate cover, Unum sent Quinlisk checks covering 16 months of benefits and interest.

[11] On August 1, 2007, Quinlisk (through her counsel) responded to Unum's letter.  She contested Unum's conclusion, and requested an opportunity to respond to the reports of Dr. Bress and Byard (which she had not seen until after Unum's determination).  Unum did not provide her with an opportunity to respond to those reports.

Although summary judgment is ordinarily a procedural tool for screening out cases that do not present trialworthy issues, in ERISA actions it is "simply a vehicle for deciding the issue." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).  This is because "the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002).  As a result, in ERISA benefit denial cases, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'"  *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006) (quoting *Orndorf*, 404 F.3d at 517).

A.      **Standard of Review**

A denial of benefits under ERISA is reviewed under a *de novo* standard "unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms . . . ."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the plan administrator has been granted such discretion, its decision must be upheld unless "arbitrary, capricious or an abuse of discretion."  *Diaz v. Seafarers Int'l Union*, 13 F.3d 454, 456 (1st Cir. 1994).

The parties do not dispute that the plan gives defendant discretionary authority, or that the "abuse of discretion" standard applies.  However, plaintiff contends that the Court must give defendant's decision extra scrutiny, within the abuse-of-discretion standard of review, because defendant both administers the long-term disability plan and pays benefits under the plan.  *See Denmark v. Liberty Life Assur. Co.*, 566 F.3d 1, 5 (1st Cir. 2009) (noting "structural conflict [of interest]" where same party administers and pays benefits under plan).  When such a structural

conflict of interest exists, the Court is required to apply the abuse of discretion standard, but must take note of the structural conflict and of any other circumstance that affects the likelihood that the benefits decision may have been biased. *See Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008). Such other circumstances may include a history of biased claims administration. (*Id.*). The Court is to consider such factors as tie-breakers; if all other relevant considerations weigh evenly, and the determination as to whether the plan administrator abused its discretion is very close, the structural conflict of interest or the administrator's history of biased claims decisions may tip the balance in the plaintiff's favor. *Id.* at 2350.

Plaintiff cites a number of cases in which courts have found that Unum has been biased in its claim decisions. *See, e.g., Radford Trust v. First Unum Life Ins. Co. of America*, 321 F.Supp.2d 226, 248-249 (D. Mass. 2004) (collecting cases). She contends that this history, along with the undisputed existence of a structural conflict of interest, should cause the Court to add extra weight to her side of the scale. However, where there is a structural conflict of interest, the Court should give it less weight (or perhaps no weight at all) if the plan administrator has implemented appropriate procedures that help remove the potential for bias and promote accuracy. *See Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. at 2351.

Plaintiff is appealing defendant's decision under the RSA's claim reassessment process to deny her long-term disability benefits after December 2003. She gained the opportunity to have her claim reassessed because Unum had a history of biased claims administration, which led to an investigation and a regulatory settlement. The RSA required that the defendant implement certain structural changes and procedures to help ensure that claims were handled in a fair and unbiased

14

manner, specifically to correct the history of biased claims administration.[12]

Accordingly, despite the structural conflict of interest, the RSA imposed significant safeguards on handling of the claim reassessment process to decrease the likelihood that reassessed claims were handled in a biased manner.  The Court will therefore apply the abuse of discretion standard of review, without any extra weight on plaintiff's side of the scale, and overturn defendant's decision only if "it is unreasonable, or arbitrary and capricious."  *See Pollini v. Raytheon Disability Empl. Trust*, 54 F. Supp. 2d 54, 58 (D. Mass. 1999).

### B.    Whether Unum Abused Its Discretion

After a review of the record, the Court concludes that defendant has, in fact, acted unreasonably, and therefore has abused its discretion.  The principal reason is that the reviewing physician made two clear factual errors in his interpretation of the record, as set forth below.  In addition, defendant appears to have unduly discounted plaintiff's pain symptoms as merely "subjective," resulting in a potentially unbalanced and incorrect view of the evidence.

### 1.    Errors  in Review of File

---

[12] For example, the RSA required defendant to add independent directors to its board.  (*See* RSA-006).  The independent directors, in addition to their normal functions, also formed a Regulatory Compliance Committee to oversee compliance with ERISA and the RSA provisions specifically.  (*See* RSA-008).  The RSA also required the formation of a Regulatory Compliance Unit (RCU), consisting of staff who were to monitor the teams reassessing denied claims.  (*Id.*).  RCU staff reported directly to the Regulatory Compliance Committee.  (*Id.*).

The teams reassessing the claims of plan participants were required to give significant weight to Social Security benefit awards and were audited periodically by the RCU for accuracy.  (*See* RSA-009-014).  The RSA further required, among other things, that claim analysts consider both objective and subjective evidence of sickness, injury, or disability, and that medical and vocational evaluators sign statements of professional conduct relative to every file that they reviewed.  (*See* RSA-016, 062).

The RSA also established quarterly meetings between defendant's board of directors and representatives of the state regulators.  (*See* RSA-009).  The regulators periodically audited a random selection of the claim reassessment team's decisions.  The RSA provides that if the regulators found benefit determination errors in more than 7% of the files audited, then defendant would be liable for a $145 million fine.  (*See* RSA-027).

Plaintiff contends that defendant committed two clear errors during the process of determining whether to award plaintiff benefits from December 2003 forward.  The Court agrees.

The first error was Dr. Bress's interpretation of the January 2002 disability report from Dr. Christensen.  The form asks how many hours of sedentary (sitting and standing) activity the plaintiff could perform; it appears to the Court that Dr. Christensen wrote "0" in response.  Dr. Bress, however, believed that the handwritten "0" was a "6."  (*See* LTD/LW-00093-00092).

The second error was Dr. Bress's misreading of Dr. Burbank's November 21, 2002 typed report of his examination of plaintiff.  The report says that she had left pelvic pain that was worse when she "walks."  (*See* RSA/CRU-01874).  However, Dr. Bress apparently thought that Dr. Burbank reported that her pain was worse when she "*talks*."  (*See* RSA/CRU-00101).  Because he could not discern any possible physiological explanation for pelvic pain that is worse when a person talks, Dr. Bress appears to have discounted this report altogether.

Those two errors, taken together, were significant, and may have affected the decision to deny benefits; certainly the Court cannot state with confidence that they were harmless.[13]  Remand to the plan administrator for reconsideration on an accurate interpretation of the record is therefore appropriate.

## 2.  <u>Evidence of Plaintiff's Pain Symptoms</u>

Plaintiff further contends that defendant ignored the reports of her treating physician and

---

[13] Plaintiff also points to a third potential error in interpreting the evidence:  she contends that Dr. Bress mistakenly came to the conclusion that she could lift 20 pounds by inaccurately interpreting the surveillance video. While Dr. Bress notes in his report that he observed plaintiff "lifting a 24 [pack] of soda (weight 18 lbs) easily with one hand on two occasions" (*See* RSA/CRU-00144), plaintiff argues that proper viewing of the video shows that she only lifted "four 12-packs of canned soda *separately*. . . . [and] alternated between one and two hands to lift [them]." (*See* Pl. Mem. at 21).  It appears to the Court that plaintiff is in fact lifting 12-packs of soda into her trunk, alternating between one and two hands to lift them.  On remand, the plan administrator should reevaluate this evidence in coming to its final conclusion.

her complaints of pain, and instead gave undue weight to the file reviews of Dr. Bress and Byard and to the video surveillance.  Defendant counters that many of plaintiff's medical reports are simply recitations of her subjective complaints of the pain that she says she was experiencing, and that while it did not ignore the subjective evidence, it chose to give more weight to objective evidence of her condition and capabilities.

In contrast to social security disability claims, there is no "treating physician" rule in ERISA disability determinations—that is, there is no requirement that an ERISA plan administrator give special weight to a treating physician's opinion.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  Plaintiff argues that the RSA did require defendant to give significant weight to the opinions of the claimant's attending physicians.[14]  Defendant responds in substance that the reports of her treating physicians did not diagnose any clinical cause for her pain, but rather simply reported that plaintiff said she was experiencing pain, and therefore are based on subjective reports rather than clinical data or medical opinion.

Difficult issues can be presented where a claimant contends that he or she is suffering from debilitating pain.  Pain is inherently subjective and unmeasurable, and different people tolerate it to different degrees.  It is particularly difficult when the etiology of the pain is not known.

---

[14] *See* RSA-015-016 ("The Company's claim procedures shall include the following ongoing objectives: (i) Increased focus on policies and procedures relating to medical and related evidence, including but not limited to the following: . . . Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP. . .); *see also* Amendment to RSA § 5 ("Section B.3.c.(i) shall be amended by adding the following factor to others relating to increased focus on policies relating to medical evidence: 'Giving significant weight to an attending physician's ("AP") opinion, if the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.  In order for the AP's opinion to be rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.'").

17

Nonetheless, a plan administrator cannot simply ignore or discount reports of pain on the grounds that it is "subjective."  It is "impermissible to require objective evidence to support claims based on medical conditions that do not lend themselves to objective verification . . . ."  *Desrosiers v. Hartford Life & Accident Ins. Co.*, 515 F.3d 87, 93 (1st Cir. 2008); *see Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (holding that the amount of pain that a patient feels is always subjective, even for a condition with clinical, objective diagnostic evidence.  It is unreasonable to require objective evidence of the severity of the pain that cannot possibly exist, or to ignore subjective evidence in this situation.).  Likewise, a medical professional's assessment of pain cannot be ignored by the plan when determining whether plaintiff is disabled.  *See Pollini*, 54 F. Supp. 2d at 60.

Moreover, even "subjective" symptoms such as pain can create objective, if circumstantial, evidence of its intensity and duration.  Here, the file did contain some objective evidence of plaintiff's pain.  For example, the nurse at Dartmouth Hichcock Medical Center reported that plaintiff had "a quite antalgic gait, favoring her left side.  After taking the few first steps her gait even[ed] out but is never smooth. It continues to be antalgic."  (*See* RSA/CRU-01909-01907).  *See also Brooking v. Hartford Life & Accident Ins. Co.*, 167 Fed. Appx. 544, *15 (6th Cir. Feb. 16, 2006) (finding a limp or antalgic gait to be objective evidence of pain).  At a minimum, defendant should have considered the evidence and provided a satisfactory explanation if it elected to discount it, rather than simply rejecting it as "subjective."[15]

---

[15] It is also noteworthy that defendant did not give consideration to the MRIs, CT scans, and examining physician reports that detailed an objectively verifiable defect (the lump) at the site of plaintiff's pain.  Although no physician was able to determine the exact cause of the lump or its precise connection, if any, to plaintiff's pain issues, the appropriate response would have been to weigh it and either accept it or discount it, with specific reasons, rather than ignoring it entirely.

18

Under the circumstances, and taken in conjunction with the errors noted above, defendant acted unreasonably in discounting plaintiff's reports of pain, and the related medical records, as merely subjective.  It need not accept those reports at face value, but it must examine the evidence with a fair and balanced approach.  Remand to defendant for further review is therefore appropriate.

### 3.    <u>Whether the "Self-Reported Symptom" Exclusion Applies</u>

Defendant contends that because no physician was able to diagnose plaintiff with a particular sickness or injury, and because the plan specifically limits benefits for self-reported symptoms to 24 months, plaintiff is not entitled to additional benefits under the plan.[16]

The Court does not need to decide whether the plan's definition of self-reported symptoms is applicable to plaintiff's condition.  Defendant did not previously notify plaintiff that the self-reported symptom provision was the basis for denying her request for post-December 2003 benefits, and therefore it may not rely on that explanation here.  *See Glista v. Unum Life Insurance Company of America*, 378 F.3d 113, 128 (1st Cir. 2004), and *Bard*, 471 F.3d at 239. In reviewing a plan administrator's decision, the Court may only consider "those rationales that were specifically articulated in the administrative record as the basis for denying a claim." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007).

---

[16] The long-term disability plan provides "[d]isabilities, due to sickness or injury, which are primarily based on *self-reported symptoms*, and disabilities due to *mental illness* have a limited pay period up to 24 months." *See* LTD/LW-00417 (emphasis in original).

"Self-Reported Symptoms" are defined by the plan to mean "the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy."  (*See* LTD/LW-00402).

Defendant contends that it mentioned the self-reported symptom benefits limitation in its letter of March 26, 2002, to plaintiff, and therefore there is reference to it in the administrative record, and the current litigation is not the first time defendant is raising the issue with plaintiff.[17] Prior to this litigation, the March 2002 letter appears to be the only correspondence between defendant and plaintiff that mentions the self-reported symptoms clause of the plan.

The ERISA statute and Department of Labor regulations specifically require that when a plan denies an employee's claim for benefits, the denial must be in writing, "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant. . ."  *See* 29 U.S.C. § 1133(a);  *see also* 29 C.F.R. § 2560.503-1(g)(1).  The plan itself provides that "[i]f your claim for a benefit is denied, in whole or in part, you must receive a written explanation of the reason for the denial."  (*See* LTD/LW-00409).  The March 2002 letter does not satisfy these provisions.  That letter was a notification to plaintiff that defendant was *approving* her request for benefits from December 2001 though March 2002.  Defendant's July 2007 letter sent to plaintiff's counsel, notifying her that it had denied her request for benefits from December 2003 through the present, did not mention the self-reported symptoms clause.

"A *post hoc* attempt to furnish a rationale for a denial of . . . benefits . . . is not acceptable."  *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685 (7th Cir. 1992).  Defendant is therefore prohibited from relying, now or in the future, upon the self-reported symptoms provision to deny benefits to plaintiff.

---

[17] The March 26, 2002 letter recites two full pages of the plan word-for-word, and then states, in relevant part, "The restrictions and limitations provided are based solely on your self-reported symptoms, labeled as vulvodynia, as no etiology has been determined.  . . . your claim is subject to the 24-month self-report limitation outlined above."  *See* LTD/LW-00334.

**V.**     **Conclusion**

Defendant's decision to deny post-December 2003 benefits to plaintiff was unreasonable, because, among other things, defendant (1) apparently misread Dr. Burbank's November 2002 report, (2) apparently misread Dr. Christensen's January 2002 report, and (3) apparently unduly discounted plaintiff's symptoms of pain and related medical records as merely "subjective."

Remand is frequently the appropriate response where the record does not support the conclusion that claimant is unequivocally entitled to benefits, but only that more information is needed.  While there are constraints on the district court's consideration of new evidence that was not before the plan administrator when reviewing an eligibility determination in an ERISA action *de novo*, *Liston v. UNUM Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003), "[r]emanding a case to the plan administrator to consider the additional evidence or to further develop the record offers an alternative solution,"  *Jorstad v. Connecticut Gen. Life Ins. Co.*, 844 F. Supp. 46, 55 (D. Mass. 1994) (citing cases).  Similarly, the Second Circuit has endorsed remand to the administrator where the court was unable to "conclude that [plaintiff's] claim *necessarily* should have been granted" as it did "not find that, upon the receipt of additional evidence, a reasonable fiduciary could only have granted the claim."  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073 (2d Cir. 1995) (emphasis added).

Here, the Court is not prepared to make a definitive judgment about plaintiff's eligibility for long-term disability benefits without more information.  That is particularly true given the conflicting medical evaluations and the disputed manner in which the resulting information was interpreted and applied by successive physicians.  "[T]he problem is not that [claimant] was

21

denied benefits to which [she] was clearly entitled; the evidence does not compel such an outcome.  The problem is with the . . . decision-making process." *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005).[18]

Accordingly, and rather than directing Unum to reach a different result, the Court will remand the case to the plan administrator for further review.  On remand, and in order to ensure that the review is entirely independent, fair, and consistent with this opinion, the Court directs that the review shall be conducted by well-qualified professionals with no previous involvement in this case.

Accordingly, and for the foregoing reasons, the motions of plaintiff Claire Quinlisk and defendant Unum Life Insurance Company of America for summary judgment are DENIED.  The case is remanded to defendant for further review in accordance with this decision.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 29, 2009

---

[18] As the court noted in *Buffonge*, this characterization of the process is not meant to suggest that the Court believes "that Prudential intentionally set up a biased process." 426 F.3d at 32 n.15.